IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

| | | |
|---|---|---|
| NATIONAL CREDIT UNION ADMINISTRATION BOARD, | ) ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | Case No. 12-2591-JWL |
| UBS SECURITIES, LLC, et al., | ) ) | |
| Defendants. | ) ) | |
| ‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾ | ) ) | |
| NATIONAL CREDIT UNION ADMINISTRATION BOARD, | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | Case No. 12-2648-JWL |
| CREDIT SUISSE SECURITIES (USA) LLC, et al., | ) ) ) | |
| Defendants. | ) | |
| ‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾ | ) | |

## <u>MEMORANDUM AND ORDER</u>

Plaintiff National Credit Union Administration Board brings these related suits

as conservator and liquidating agent of credit unions.  The suits relate to a number of

offerings  involving  different  residential  mortgage-backed  securities  ("RMBS"  or

"certificates") purchased by the credit unions.  Plaintiff asserts claims under federal and

state law against sellers, underwriters, and issuers for the certificates, based on alleged

untrue statements or omissions of material facts relating to each certificate.[1]

The cases presently come before the Court on two motions by defendants for summary judgment with respect to certain misrepresentations and omissions, and on various related motions by the parties to exclude expert testimony. As more fully set forth herein, the Court rules as follows:

Defendants' separate motions for summary judgment with respect to certain alleged misrepresentations and omissions (Doc. # 437 in *UBS*, Case No. 12-2591; Doc. # 403 in *Credit Suisse*, Case No. 12-2648) are **granted in part and denied in part**. Defendants' motions are granted with respect to any claims under Section 11 based directly on mortgage loan schedules (MLSs) and with respect to any other claims based directly on MLSs that were not filed with the SEC. Defendants' motions are also granted with respect to claims based on certain representations concerning summary statistical tables. Credit Suisse's motion is also granted with respect to claims based on representations concerning compliance with applicable laws. Defendants are granted judgment to the extent that plaintiff asserts such claims. The motions are otherwise denied.

Plaintiff's motion to exclude certain testimony by defendants' reunderwriting rebuttal experts, W. Barefoot Bankhead (*UBS*) and Peter Kempf (*Credit Suisse*), (Doc. # 423 in *UBS*, Case No. 12-2591; Doc. # 389 in *Credit Suisse*, Case No. 12-2648) is

---

[1]The Court refers to the defendants in Case No. 12-2591 collectively as "UBS". The Court refers to the defendants in Case No. 12-2648 collectively as "Credit Suisse".

**denied**.

Defendants' separate motions to exclude certain testimony by plaintiff's reunderwriting experts, Richard Payne (*UBS*) and Steven Butler (*Credit Suisse*), (Doc. # 432 in *UBS*, Case No. 12-2591; Doc. # 405 in *Credit Suisse*, Case No. 12-2648) are **granted in part and denied in part**.  The motions are granted with respect to any testimony regarding stratified statistical summary tables in the offering documents and any testimony regarding an MLS that is not the subject of a surviving claim.  Credit Suisse's motion is also granted with respect to any testimony by Mr. Butler concerning materiality to a reasonable investor in these securities.  Such testimony shall be excluded at trial.  The motions are otherwise denied.

Defendants' joint motion to exclude certain credit risk opinions by plaintiff's experts (Doc. # 427 in *UBS*, Case No. 12-2591; Doc. # 394 in *Credit Suisse*, Case No. 12-2648) is **granted in part and denied in part**.  The motion is granted with respect to any testimony by Mr. Butler concerning an increase in credit risk in an absolute sense, and such testimony shall be excluded.  The motion is otherwise denied.

## I. <u>Defendants' Motions for Summary Judgment</u>

### A. <u>*Governing Standards*</u>

Summary judgment is appropriate if the moving party demonstrates that there is "no genuine dispute as to any material fact" and that it is "entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(a).  In applying this standard, the court views the

evidence and all reasonable inferences therefrom in the light most favorable to the nonmoving party. *Burke v. Utah Transit Auth. & Local 382*, 462 F.3d 1253, 1258 (10th Cir. 2006). An issue of fact is "genuine" if "the evidence allows a reasonable jury to resolve the issue either way." *Haynes v. Level 3 Communications, LLC*, 456 F.3d 1215, 1219 (10th Cir. 2006). A fact is "material" when "it is essential to the proper disposition of the claim." *Id*.

The moving party bears the initial burden of demonstrating an absence of a genuine issue of material fact and entitlement to judgment as a matter of law. *Thom v. Bristol-Myers Squibb Co.*, 353 F.3d 848, 851 (10th Cir. 2003) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986)). In attempting to meet that standard, a movant that does not bear the ultimate burden of persuasion at trial need not negate the other party's claim; rather, the movant need simply point out to the court a lack of evidence for the other party on an essential element of that party's claim. *Id.* (citing *Celotex*, 477 U.S. at 325).

If the movant carries this initial burden, the nonmovant may not simply rest upon the pleadings but must "bring forward specific facts showing a genuine issue for trial as to those dispositive matters for which he or she carries the burden of proof." *Garrison v. Gambro*, Inc., 428 F.3d 933, 935 (10th Cir. 2005). To accomplish this, sufficient evidence pertinent to the material issue "must be identified by reference to an affidavit, a deposition transcript, or a specific exhibit incorporated therein." *Diaz v. Paul J. Kennedy Law Firm*, 289 F.3d 671, 675 (10th Cir. 2002).

Finally, the court notes that summary judgment is not a "disfavored procedural shortcut;" rather, it is an important procedure "designed to secure the just, speedy and inexpensive determination of every action." *Celotex*, 477 U.S. at 327 (quoting Fed. R. Civ. P. 1).

B.      *Alleged Misrepresentations After the Trade Dates*

Defendants first seek summary judgment with respect to any alleged false or misleading statement contained in a document (a prospectus supplement, free writing prospectus (FWP), or mortgage loan schedule (MLS)) that was filed with the SEC after the trade date for that certificate and thus was not available or conveyed to the credit union at the time that the credit union made its purchase commitment. As they do with respect to most of the arguments in these motions for summary judgment, defendants make only summary arguments and incorporate by reference the arguments made by defendant RBS in a summary judgment motion filed in a related case in this Court. As set forth below, the Court denies the motions as they relate to such allegations.

1.      SECTION 11

The Court first addresses this argument as it relates to plaintiff's claims under Section 11 of the federal Securities Act, 15 U.S.C. § 77k. Those claims include claims based on prospectus supplements, but they do not include any claims directly based on free writing prospectuses (as ruled in a prior order in these cases, *see NCUAB v. RBS Sec., Inc.*, 2015 WL 789983, at *3 (D. Kan. Feb. 25, 2015) (Lungstrum, J.)) or on MLSs (*see infra* Part III.A).

5

In arguing that Section 11 liability may not be based on prospectus supplements issued after the applicable purchase commitments, defendants rely on *APA Excelsior III L.P. v. Premiere Technologies, Inc.*, 476 F.3d 1261 (11th Cir. 2007), in which the Eleventh Circuit held that a Section 11 claim could not be based on a registration statement issued after the time of the purchase commitment. *See id.* That case and others following it are easily distinguished, however, because in the present case there is no contention that the purchase commitments preceded the issuance of the applicable registration statements. Rather, the present cases concern *prospectus supplements* arguably issued after the purchase commitments. Thus, SEC Rule 430B—a rule not discussed in the cases on which defendants rely—is applicable here.

Rule 430B was promulgated as a part of 2005 reforms in the SEC's rules relating to the offering process. *See FHFA v. Bank of America Corp.*, 2012 WL 6592251 (S.D.N.Y. Dec. 18, 2012) (Cote, J.) (discussing 2005 reforms at length). Prior to 2005, written offers could be made only through a prospectus meeting all of the requirements of Section 10(a) of the Securities Act, but the reforms allowed for offers without the provision of all required disclosures, as long as a final prospectus was eventually issued within a certain time frame. *See id.* at *3-4. As a part of that new scheme, Rule 430B provides that information contained in a required final prospectus "shall be deemed to be part of and included in the registration statement on the earlier of" (i) the date the final prospectus is first used and (ii) the date of the first contract of sale for those securities. *See* 17 C.F.R. 230.430B(f)(1). Thus, as the court held in *Bank of America*,

6

the prospectus supplements at issue are deemed to be part of the registration statements at least as of dates prior to any sale contracts, which fact undermines the premise of defendants' argument against Section 11 liability.

Defendants do not argue that Rule 430B does not apply to these prospectus supplements. Defendants' sole response to this effect of Rule 430B is to argue that the rule is actually concerned with timing only for purposes of applying the statute of repose. The Court rejects that argument, however, as this provision of the rule contains no such limiting language, *see id.*, and the language that mirrors language in the statute of repose is actually found in the following separate provision in Rule 430B, *see id.* § 230.430B(f)(2). *See also Bank of America*, 2012 WL 6592251, at *4 n.6 (rejecting similar argument for the same reason).

Finally, the SEC's 2005 Release in which it explained the new regulations (to which both sides cite) supports this conclusion that Section 11 liability may be based on these prospectus supplements, even if the supplements were issued after the relevant purchase commitments. For instance, the SEC stated: "Information contained in a *prospectus or prospectus supplement* that is part of a registration statement that is *filed after the time of the contract of sale* will be part of and included in a registration statement *for purposes of liability under Section 11* at the time of effectiveness, which may be at or before the time of the contract of sale." *See* S.E.C. Release No. 75, 85 S.E.C. Docket 2871, 2005 WL 1692642, at *77 (Aug. 3, 2005) ("2005 Release") (emphasis added). The SEC further stated:

7

> We are adopting provisions in Rule 430B that will make clear that information contained in a prospectus supplement required to be filed under Rule 424 . . . will be deemed part of and included in the registration statement containing the base prospectus to which the prospectus supplement relates.   . . .   As a result of Rule 430B . . ., prospectus supplements required to be filed . . . will, *in all cases*, be deemed to be part of and included in registration statements for purposes of Securities Act Section 11.

*See id.* at *84 (emphasis added).  Defendants have not cited to any authority suggesting a different interpretation of Rule 430B.

Accordingly, for purposes of liability under Section 11, the prospectus supplements at issue here are deemed to be part of the corresponding registration statements at least as of a time prior to any sales.  Therefore, there is no basis to conclude that Section 11 liability may not attach in this case merely because the prospectus supplements were issued after the trade dates in accordance with the revised 2005 scheme that allowed defendants to issue the supplements when they did.  The Court thus denies summary judgment with respect to these claims under Section 11.

## 2.   SECTION 12(a)(2) AND STATE LAWS

Defendants make the same argument with respect to claims under Section 12(a)(2) of the Securities Act, California law, and Kansas law, to the extent based on statements in prospectus supplements, FWPs, and MLSs that were issued after the trade dates for those certificates.[2]  The Court begins with the text of Section 12 (on which the

---

[2]Both sides have treated these three statutes as indistinguishable for purposes of this argument.

California and Kansas statutes were modeled), which provides for liability in the event that a person offers or sells a security "by means of" a prospectus or oral communication that includes a material misrepresentation or omission. *See* 15 U.S.C. § 77*l*(a)(2). Defendants have not addressed the "by means of" requirement in their arguments. Although there is no requirement to prove the purchaser's reliance on the alleged misrepresentation, *see United Food and Commercial Workers Union Local 880 Pension Fund v. Chesapeake Energy Corp.*, 774 F.3d 1229, 1233 (10th Cir. 2014) (no reliance element under Section 11 or Section 12(a)(2)), federal appellate courts have generally interpreted the "by means of" language of Section 12 to require some causal connection to the purchase, such that the prospectus was used to effect the sale or was instrumental in the sale. *See, e.g.*, *In re Access Cardiosystems, Inc.*, 776 F.3d 30, 35-36 (1st Cir. 2015) (citing *Sanders v. John Nuveen & Co.*, 619 F.2d 1222, 1225 (7th Cir. 1980), and *Jackson v. Oppenheim*, 533 F.2d 826, 830 & n.8 (2d Cir. 1976)).

   In these cases, applying the plain meaning of the statute, the sales were made "by means of" the documents at issue because those documents were filed to supplement the information previously disclosed concerning the securities. Indeed, under the 2005 reforms that allowed these securities to be offered before all required disclosures were made, the lawfulness of any sales depended on the eventual issuance of final prospectuses, and those prospectuses were thus essential "means" through which the securities were sold. *See Bank of America*, 20126592251, at *5; *FHFA v. Nomura Holding Am., Inc.*, 68 F. Supp. 3d 499, 507 (S.D.N.Y. 2014) (Cote, J.) (quoting *Bank of*

*America*).  In fact, in *Jackson*, the Second Circuit noted that liability could be based on a prospectus mailed after the sale, which result "can be understood as an enforcement mechanism" for the requirement that the prospectus be sent.  *See Jackson*, 533 F.2d at 829 n.10.  In the same way, liability for misrepresentations in post-sale offering documents serves as an enforcement mechanism for the requirement that the additional disclosures be made.  Under defendants' argument, such disclosures would be required but need not be truthful.  *See Feiner v. SS&C Tech., Inc.*, 47 F. Supp. 2d 250, 253 (D. Conn. 1999) (rejecting such a result in holding that Section 12(a)(2) liability is "coextensive with the statutory and regulatory prospectus-delivery requirements").

Defendants have not cited any authority suggesting that the "by means of" requirement precludes liability based on a post-purchase prospectus.  Instead, defendants rely on SEC Rule 159(a), another rule promulgated as part of the 2005 reforms.  Rule 159(a) provides as follows:

> For purposes of section 12(a)(2) of the Act only, and without affecting any other rights a purchaser may have, for purposes of determining whether a prospectus or oral statement included an untrue statement of a material fact or omitted to state a material fact necessary in order to make the statements, in light of the circumstances under which they were made, not misleading at the time of sale (including, without limitation, a contract of sale), *any information conveyed to the purchaser only after such time of sale (including such contract of sale) will not be taken into account.*

*See* 17 C.F.R. § 230.159(a) (emphasis added).  Defendants argue that this provision precludes section 12(a)(2) liability for post-sale misrepresentations.

Defendants cite this Court's prior opinion in these cases by which the Court

rejected defendants' argument for dismissal based on Rule 159(a).  *See RBS*, 2015 WL 789983, at *4.  The Court concluded that the complaints did not necessarily preclude claims based on post-trade-date FWPs as a matter of law because the dates listed for FWPs in the complaints did not necessarily coincide with the dates on which the FWPs may have been conveyed to the purchasers for purposes of Rule 159(a).  *See id.*  The Court further ruled that plaintiff was not required to plead affirmatively facts showing compliance with Rule 159(a), although "[p]laintiff will eventually need to prove that the information in the FWPs was conveyed to the purchasers prior to the time of sale."  *See id.*  Relying on this statement, defendants argue that this Court has already ruled that Rule 159(a) does require such proof here.  At that time, however, the Court was not asked to decide whether Rule 159(a) actually imposed such a requirement; rather, the Court assumed (as the parties did) that there was such a requirement, and it proceeded to rule that a violation of any such requirement could not be determined as a matter of law at that stage.

The Court is now directly confronted with this issue, and it concludes that Rule 159(a) does *not* actually require that a prospectus have been conveyed to the purchaser by the time of sale in order for that prospectus to give rise to liability under Section 12(a)(2).  Rule 159(a) does not state that Section 12(a) liability may not be based on a post-sale prospectus (as the SEC could easily have stated).  Rather, for purposes of determining whether a prospectus included a material misstatement—thus, either for determining falsity or materiality—"information" (not the prospectus) conveyed after

11

sale will not be considered.  Thus, falsity and materiality will be determined based on information available to the purchaser at the time of sale, and later-conveyed information cannot "cure" that falsity or materiality.  Accordingly, like the court in *Nomura*, *see* 68 F. Supp. 3d at 507-08, the Court interprets Rule 159(a) not to preclude liability under Section 12(a)(2) based on misrepresentations or omissions in post-sale prospectuses. Indeed, as other courts have noted, reliance need not be proved under Section 12(a)(2), and requiring the alleged misstatements to have been conveyed to the purchaser before the sale would effectively introduce a reliance element.  *See Sanders*, 619 F.2d at 1225-26 & n.4 (quoting *Demarco v. Edens*, 390 F.2d 836, 841 (2d Cir. 1968)).

Nor does the SEC's explanatory 2005 Release (on which defendants also rely) contain any statement indicating that Rule 159(a) precludes liability under Section 12(a)(2) for misrepresentations in post-sale prospectuses.  To the contrary, the 2005 Release indicates that FWPs and final prospectuses may provide the bases for Section 12(a)(2) claims.  *See* 2005 Release, 2005WL 1692642, at *45, 62 (liability provisions of Section 12(a)(2) protect against material misstatements in FWPs; any sale or offer by means of a FWP "will be subject to disclosure liability under Securities Act Section 12(a)(2)").  The SEC further noted in the Release that "an investor's purchase commitment and the resulting contract of sale of securities to the investor in the offering generally occur before the final prospectus is required to be delivered under the Securities Act."  *See id.* at *100.  The SEC elaborated in a footnote as follows:

Professor Louis Loss has noted that "[a] prospectus that comes with the

> security does not tell the investor whether or not he or she should buy; it tells the investor whether he has acquired a security or a lawsuit." L. Loss & J. Seligman, *Securities Regulation*, § 2-b-3 (3d ed. 2001). See also Cohen, *Truth in Securities Revisited*, 79 Harv. L. Rev. 1340, note 20, at 1386 (criticizing the requirement that a final prospectus be delivered after an investment decision is made and noting that information essential to a transaction should, to the extent practicable, be required to be provided in time for use in an investment decision). The final prospectus also can be a basis for liability claims under Securities Act Section 12(a)(2).

*See id.* at *100 n.555. This statement that the final prospectus may provide a basis for Section 12(a)(2) liability, while noting criticism that such disclosure may not precede the purchase decision, makes clear the SEC's position Section 12(a)(2) liability may be based on post-sale prospectuses.[3] Moreover, as discussed above, such liability is consistent with the plain language of the statute. Accordingly, the Court rejects the basis for defendants' argument with respect to Section 12(a)(2) and the state statutes, and it therefore denies the motion for summary judgment with respect to these alleged misstatements.

### C.   *Mortgage Loan Schedules (MLSs)*

Defendants also seek summary judgment on plaintiff's claims based on misrepresentations or omissions in mortgage loan schedules (MLSs). First, defendants

---

[3]In a separate paragraph of the footnote, the SEC noted that Rule 159 "also provide[s] that liability under Section 12(a)(2) is assessed based on the information conveyed at the time of the contract of sale." *See id.* at *100 n.555. The SEC did not thereby suggest that Rule 159 limits its preceding statement that Section 12(a)(2) liability may be based on a final prospectus; rather, it was "also" noting a separate feature of the new rules as they relate to post-sale prospectuses (that is, the inability of the final prospectus to cure a prior misrepresentation).

argue that plaintiff may not assert Section 11 claims based on MLSs because those documents were not incorporated into any registration statement, and that plaintiff may not assert Section 12 or state-law claims based on any MLSs that were not filed with the SEC.  Plaintiff concedes that it is pursuing claims based directly on misrepresentations and omissions in MLSs only under Section 12 and California and Kansas law for MLSs publicly filed with the SEC (relating to 6 of 22 certificates in *UBS*, 11 of 20 certificates in *Credit Suisse*).  Thus, the Court grants defendants summary judgment on any claims directly based on MLSs that have been asserted under Section 11, and on any claims directly based on MLSs under Section 12 or state law relating to the other 16 certificates in *UBS* and the other 9 certificates in *Credit Suisse* (as identified in the parties' briefs). Plaintiff notes that it has also asserted claims based on misrepresentations in other documents to the effect that the MLSs are accurate, and defendants have not addressed such claims in this argument.

Second, defendants contend that there is no evidence that the MLSs were conveyed to the credit unions or filed with the SEC before the trade dates for the certificates.  With respect to claims based directly on the MLSs, the Court rejects this argument for the same reasons set forth above in the preceding section.  *See supra* Part II.B.  Defendants have not explained why such evidence would be required to support plaintiff's indirect MLS claims that are based on misrepresentations or omissions in other documents.  Thus, the Court denies this argument for summary judgment.

Third, defendants argue that there is no evidence that plaintiff's experts based

14

their loan analyses on the same MLSs that are referenced in the offering documents. The Court rejects this argument. Defendants produced in discovery the MLSs used by plaintiff's experts, and they produced them while stating their belief that they were producing the correct MLSs. Those statements provide sufficient evidence from which a jury could conclude that the experts used the appropriate MLSs.[4]

### D.   *Stratified Summary Statistical Tables*

Defendants seek summary judgment on plaintiff's claims based on certain representations (identified in Appendix B to each defendant's brief) to the effect that certain summary statistical information for the loans' collateral characteristics (relating to LTV, CLTV, DTI, and owner-occupancy statistics) was accurate. Defendants argue that plaintiff has no evidence that any figures in these statistical tables were actually incorrect. The particular tables did not contain loan-level information; rather, they provided statistics about the number of loans falling within particular statistical ranges. Defendants note that plaintiff's experts, after they completed their loan-by-loan analyses, did not conduct any further analyses to determine the exact effect on the statistical summaries of those loans.

In response, plaintiff argues that its experts determined that a significant percentage of the loans had errors, and that the tables therefore were based on bad data.

---

[4]Credit Suisse further argues that some MLSs actually contain different categories of information than the categories referenced by plaintiff's expert Steven Butler. In response, plaintiff has confirmed that its MLS-based claims do not extend beyond information actually found in the corresponding MLSs.

Plaintiff has provided no evidence, however, that any particular statement in a summary statistical table was actually false. For example, one table broke down the number of loans falling into particular ranges of LTV ratios (such as a range of 50 to 54.99 percent). If a particular loan's ratio was incorrect but still fell within the same range (for instance, stated as 54 percent instead of 52 percent), however, the number of loans within that range would not change, and that summary statistic was not falsely stated. Plaintiff has not provided any evidence from which a jury could determine that any particular figure in a summary statistical table was actually incorrect (or that the extent of any errors in a table was material). Accordingly, the Court grants defendants summary judgment on claims based on the representations regarding summary statistical evidence that were identified in defendants' appendices.[5]

### E.   *Representations Concerning Third Parties*

In summary fashion, for the same reasons argued by RBS in its summary judgment motion in the related case, defendants seek summary judgment on plaintiff's claims based on alleged misrepresentations concerning contractual representations to be made by third parties. RBS argued (and thus defendants argue) that the representations at issue were literally true because the third parties did in fact make such contractual

---

[5]The Court's ruling applies only to stratified tables listing the number of loans that fall within specified ranges for certain metrics. The parties have not specifically addressed any other representations of summary statistics, such as representations of averages for a particular metric for the loans in a particular pool; thus, the Court has not considered whether any claims based on such other representations are supported by sufficient evidence of falsity.

warranties and representations.  In a prior joint order, issued in *RBS* and these cases, the

Court addressed the same argument challenging claims based on representations that

third parties had represented or would represent that loans had been made in compliance

with applicable laws and regulations or that no fraud had taken place with respect to the

loans.  *See RBS*, 2015 WL 789983, at *4-5.  In opposition to that motion, plaintiff argued

that "such statements, despite being literally true, were misleading, in that they, coupled

with the alleged statements that underwriting guidelines would be followed, gave

purchasers the impression that there would in fact be compliance with the applicable

laws."  *See id.* at *5.  The Court agreed with plaintiff that such claims were not ripe for

dismissal, as follows:

> [T]he Court cannot say at this stage as a matter of law that these
> statements by defendants could not be found to have been misleading.
> Such a conclusion would require a much more thorough analysis of the
> general and specific contexts of these statements than the parties have
> undertaken here.  Moreover, plaintiff reasonably argues that defendants
> must have intended such statements—especially when considered together
> with defendants' statements about compliance with underwriting
> guidelines—to reassure purchasers about compliance with the applicable
> laws and regulations.

*See id.* (footnote omitted).

Plaintiff argues that defendants have still not undertaken the necessary detailed

analysis sought by the Court in its prior order.  With respect to the context of the

statements, plaintiff not only points to defendants' statements about compliance with

underwriting guidelines, it also notes that defendants undertook due diligence analyses

presumably to make sure that only compliant loans were selected for inclusion within the

certificates.  Thus, plaintiff argues, a jury could reasonably infer that defendants had a reasonable basis to know whether the third-party representations were true and that defendants would have disclosed any belief that such representations were false.  Finally, plaintiff notes that defendants have not provided any evidence or argument concerning how a reasonable investor would have reacted to these representations.

In the argument adopted by defendants, RBS argued that it was providing the context requested by the Court, but RBS failed to provide any meaningful analysis. Rather, RBS merely cited disclosures that suggested that loan-level breaches could occur.  The possibility that there may be bad loans, however, does not mean that a purchaser would not believe that the third-party representations were substantially true, particularly in light of the other considerations cited by plaintiff.  In its reply brief (incorporated by defendants), RBS argued that it did not intend any reassurance about third-party representations; the cases cited by RBS in support of that argument, however, are not helpful, as they turned on particular language not present here.  RBS also argued that the intent in these transactions was to allocate risk to the third parties, and that purchasers could pursue contract claims against the third parties if the contractual representations proved false.

Such questions are for the jury, however, and the Court therefore rejects this argument for summary judgment.  Viewing the evidence in the light most favorable to plaintiff, a reasonable jury could conclude that defendants' statements about third-party representations were misleading as argued by plaintiff.  Defendants have still not

undertaken an analysis of the general and specific contexts of these representations sufficient to persuade the Court as a matter of law that these representations could not be found to have been misleading, particularly in light of the considerations cited by plaintiff and previously noted by the Court. Again, the disclosure by defendants that individual breaches were possible does not necessarily equate with a disclosure that the third-party representations should not be believed. Moreover, defendants have not provided any authority suggesting that the availability of a contract claim against other parties precludes the claims against defendants in these cases. Accordingly, the Court denies the motion for summary judgment with respect to claims based on representations concerning third-party statements.

### F.    *Compliance with Applicable Laws*

Credit Suisse asserts an additional basis for summary judgment not argued by UBS or RBS. Credit Suisse seeks summary judgment with respect to claims based on representations in the offering documents regarding compliance with applicable laws. Credit Suisse notes that Mr. Butler, plaintiff's expert, did not offer any opinion or perform any analysis concerning any loan's compliance with applicable laws or regulations. Thus, Credit Suisse argues that plaintiff has no evidence that the statements regarding compliance with applicable laws were false.

In response, plaintiff has cited only evidence regarding Credit Suisse's own due diligence and quality control analyses. Plaintiff argues that such evidence creates a question of fact for the jury, but it has not identified any particular law or regulation

violated by any loan.

The Court concludes that summary judgment is warranted here. Plaintiff relies on the due diligence report by Credit Suisse's expert, but the portion cited by plaintiff notes only that certain loans were classified as "Event 3". The expert elsewhere in his report made clear that classification as Event 3 did not necessarily mean that loans did not comply with applicable laws or regulations. Similarly, in the portions cited by plaintiff, Credit Suisse's quality control reports only identify loans with critical issues or ineligible loans, but they do not state that any loans violated laws or regulations. Plaintiff has not explained how any such loans would violate particular laws or regulations, and thus plaintiff has not met its burden to submit evidence from which a jury could determine that the statements at issue were actually false. Accordingly, the Court grants summary judgment in favor of Credit Suisse on these claims by plaintiff.

## II.   **Plaintiff's Motion to Exclude – Bankhead and Kempf**

Plaintiff retained experts—Richard Payne (in *UBS*) and Steven Butler (in *Credit Suisse*)—to reunderwrite various sample loans underlying the certificates at issue in these cases. In rebuttal to those experts' opinions, defendants offer opinions by their own experts, W. Barefoot Bankhead (in *UBS*) and Peter Kempf (in *Credit Suisse*). Plaintiff seeks to exclude expert testimony by Messrs. Bankhead and Kempf on the basis that those experts improperly opined whether the loans were reasonably underwritten at

the time of origination.  The Court denies the motion to exclude.[6]

Plaintiff asserts claims based on representations in the offering documents that the loans underlying the certificates had certain characteristics (for instance, with respect to certain metrics).  Plaintiff also asserts claims based on the representations in the certificates' prospectus supplements (as described by plaintiff in its brief) that "the underlying mortgages were originated in compliance with underwriting guidelines." Plaintiff argues that the guideline-compliance representations would have been understood by reasonable investors to mean both that the originators of the loans followed certain processes and that the loans actually complied with substantive metrical standards set forth in the originators' underwriting guidelines.  Consistent with that interpretation, plaintiff's experts, in reunderwriting loans, considered information not available at the time of the loans' origination, and they attempted to determine whether the loans' actual characteristics (for instance, the borrower's debt-to-income (DTI) ratio) satisfied the underwriting guidelines' standards for those characteristics.  Defendants' experts then criticized plaintiff's experts for relying on post-origination evidence and for failing to determine whether the originator acted reasonably or properly in compliance with the applicable guidelines in light of the information that the originator knew or should have known at the time of the origination.  Plaintiff argues, based on its

---

[6]The standards governing the Court's consideration of the motions to exclude expert testimony are stated in the Court's prior opinions in these cases by which it ruled on other motions to exclude.

interpretation of the representation that the loans were originated in compliance with guidelines, that the reasonable belief of an originator at origination is irrelevant. Plaintiff thus seeks to exclude the opinions of Messrs. Bankhead and Kempf.

Exclusion of the expert testimony as argued by plaintiff would thus require a ruling as a matter of law that a reasonable investor would interpret the guideline-compliance representation as plaintiff does. The Court cannot make such a ruling at this time, however, especially because plaintiff has not sought summary judgment on that issue. The jury in this case will decide whether the guideline-compliance representation was materially false or misleading, based on its determination of how a reasonable investor would have understood the representation in the context of the offering documents—and the Court concludes that a reasonable jury could decide this issue in favor of defendants. In that regard, the Court notes that the offering documents did not state that the *loans* would comply with the applicable guidelines, but instead represented that the loans would be *originated* in compliance with the guidelines. Based on that distinction and on other language indicating that some loans could be non-compliant or that borrowers could makes misrepresentations, a reasonable jury could find that a reasonable investor would have understood that representation to mean that the originators would properly apply the guidelines in light of information available to the originators, and not to provide a guarantee that the loans would actually satisfy all

substantive guidelines.[7]  Accordingly, because the reasonableness of the originators,

given the information that they knew or should have known at the time, could be relevant

to the jury's determination of that issue, the challenged testimony by Messrs. Bankhead

and Kempf may also be relevant, and the Court denies the motion to exclude that

testimony.

Moreover, the originators' judgment and belief at the time of origination are

distinct from defendants' own belief or intent in making the representations in the

offering documents; thus, the Court rejects plaintiff's argument that defendants'

interpretation of the guideline-compliance representation would improperly introduce

a scienter element.  The Court also rejects plaintiff's argument (asserted in its reply brief)

based on the Court's previous conclusion that defendants could not avoid liability on the

basis that the misrepresented information was provided by a third party (the borrower).

---

[7]The variety of possible reasonable findings is demonstrated by the cases on which the parties rely most heavily.  In *FHFA v. Nomura Holding America, Inc.*, 74 F. Supp. 3d 639 (S.D.N.Y. 2015), on which plaintiff relies, the court concluded, in ruling on a motion in limine in advance of a bench trial, that "[i]n representing that the loans were originated in accordance with their Originators' guidelines, the Prospectus Supplements represent that the loans within each SLG did in fact meet the criteria set forth in their Originators' guidelines."  *See id.* at 653.  On the other hand, in *U.S. Bank, National Ass'n v. UBS Real Estate Securities Inc.*, __ F. Supp. 3d __, 2016 WL 4690410 (S.D.N.Y. Sept. 6, 2016), the court concluded after a bench trial that, with respect to a warranty that each mortgage loan was underwritten in accordance with applicable guidelines, any breach analysis had to be based on information available to the underwriters.  *See id.* at *56-57.  The question of how a reasonable investor would interpret the offering documents would ordinarily provide a question of fact for the jury, and the parties have not suggested otherwise.  The Court declines to follow *Nomura* to the extent that the court in that case concluded that the interpretation of the offering documents could be decided as a matter of law before trial.

That previous ruling is not implicated here.  If defendants represented that a loan would have certain characteristics and that representation proved false because of a borrower misrepresentation, defendants may still be liable.  Here, however, the issue is what defendants actually represented.

Plaintiff points out that the challenged testimony (relating to how reasonable originators would have acted) would not be relevant to rebut plaintiff's experts' opinions to the extent that they relate to the falsity of other representations, such as those contained in MLSs or other statements of the loans' characteristics.  Any such potential confusion, however, may be addressed at trial with a limiting instruction as appropriate.  Moreover, general criticisms by Messrs. Bankhead and Kempf of plaintiff's experts' use of post-origination evidence (for instance, relating to the reliability of such evidence) could be relevant to the falsity of representations that the loans had certain characteristics.  Accordingly, the Court denies plaintiff's motion in its entirety.

### III.    Defendants' Motions to Exclude – Payne and Butler

In separate but related motions, UBS and Credit Suisse seek to exclude all expert testimony by plaintiff's respective reunderwriting experts, Richard Payne and Steven Butler.  With respect to some arguments, defendants have adopted arguments made by RBS and Nomura in a related case in this Court (in motions not ruled before that case was resolved).

#### A.    *Use of Post-Origination Information*

24

Defendants argue that the experts' testimony should be excluded because they relied on post-origination evidence in reunderwriting some loans.  Based on their interpretation of the guideline-compliance representation, defendants argue that such evidence is irrelevant because it was not available to the original underwriters.  As the Court concluded in the preceding section, *see supra* Part II, the interpretation presents a question for the jury and cannot be decided as a matter of law.  Thus, the jury could find such evidence helpful in determining the falsity of the guideline-compliance representation.  Moreover, there is no reason why later evidence cannot be probative with respect to a prior fact (a subsequent-year tax return might contain evidence of income in a prior year, for example).  Thus, post-origination evidence could also be relevant with respect to claims based on representations that the loans actually contained certain characteristics (such as claims based on the MLSs).[8]

By reference to RBS's briefs, defendants also argue that the experts did not reliably consider post-origination evidence, but the Court concludes that any such criticisms go to the weight of the testimony and not to its admissibility.  The Court also rejects any argument for exclusion under Fed. R. Evid. 403.  Accordingly, the Court denies the motions to exclude on this basis.

---

[8]Although these defendants did not make the argument, RBS argued that representations concerning loan characteristics would be understood by investors to mean that the characteristics were accurately stated only in light of information available as of the specified cut-off dates.  Any such question of interpretation is for the jury, however, and thus testimony based on post-cut-off information could be relevant.

B.      *MLSs and Stratified Summary Statistical Tables*

Defendants next challenge the experts' testimony with respect to stratified summary statistical tables in the offering documents and discrepancies in the MLSs, primarily for the same reasons set forth in defendants' summary judgment motions. As set forth above, the Court grants summary judgment in favor of defendants on plaintiff's claims based on the stratified tables. *See supra* Part I.D. Accordingly, any expert testimony concerning the falsity those tables would be irrelevant to any surviving claim, and the Court grants the motion to exclude any such testimony.

The Court also grants summary judgment with respect to some claims based on the MLSs, but the following claims survive: (a) claims under Section 12 or state law based on MLSs that were filed with the SEC and (b) claims based on other representations that turn on the accuracy of MLSs. *See supra* Part I.C. Thus, the motion to exclude MLS-based expert testimony is granted only with respect to MLSs for which no claim (direct or indirect) survives.

The Court also rejects UBS's argument that the mere comparison of data from the MLS against data from other sources does not require expert testimony. Plaintiff's experts in many cases undertook a reunderwriting analysis to determine the proper figure to compare against the MLS, and even in other cases, the experts' experience and expertise with such metrics could prove helpful in making the comparison. Accordingly, the Court denies the request to exclude all expert testimony relating to the MLSs, and plaintiff's motion is granted only to the extent noted.

C.    *Missing Documents*

Defendants argue that these experts' opinions are not reliable because, with respect to many reunderwritten loans, they assumed that any documents missing from the file were also missing at the time of origination. Defendants argue that the experts lacked a sufficient basis for that assumption and that the experts often ignored other evidence suggesting that the missing documents were present at origination.

The Court rejects this argument for exclusion, as the experts' assumptions were not without basis. For instance, the experts chose not to reunderwrite loans if the files were missing key documents or too many documents, which process excluded the files most likely to have suffered losses since origination. The experts also noted that certain facts—the digitization of most loan files, the incentives to maintain complete files—supported their assumption that missing documents were also missing at the time of origination. With respect to specific loans, defendants are free to argue to the jury that the experts' assumptions should have been overcome by other evidence; but there is no basis for a blanket exclusion of all testimony regarding loans with missing documents. The Court denies the motion for exclusion on this basis.

D.    *Use of Industry Standards*

Credit Suisse argues that Mr. Butler improperly relied on industry underwriting standards in forming his reunderwriting opinions. Credit Suisse argues that because the offering documents represented that certain underwriting guidelines had been applied, Mr. Butler should not have used any standards outside those guidelines in reunderwriting

the loans.  Credit Suisse also argues that Mr. Butler lacked a sufficient basis for the industry standards that he applied and that those standards sometimes conflicted with the applicable guideline standards.

The Court rejects these arguments for exclusion.  Plaintiff notes that the underwriting guidelines require an evaluation of the borrower's ability and willingness to repay the loan, and Mr. Butler has relied on industry standards in making such an evaluation.  Credit Suisse has not offered any contrary evidence (from an expert, for instance) that an underwriting expert would not rely on certain standards within the industry in exercising his professional judgment to evaluate a borrower's ability and willingness to repay.  Moreover, the Court concludes that Mr. Butler may base his use of such standards on his experience and expertise.  Accordingly, there is no basis for a blanket exclusion of all opinions in which Mr. Butler applied industry standards.  To the extent that Credit Suisse believes that Mr. Butler's use of an industry standard in reunderwriting a particular loan contravenes an applicable guideline, it may make such argument at trial to the jury.  The same is true with respect to Mr. Butler's use of Bureau of Labor Statistics (BLS) data in evaluating a borrower's income.  Plaintiff cites the BLS Commissioner's testimony that the data was not intended as a tool to establish prevailing wages; but Fed. R. Evid. 703 allows an expert to rely on data on which experts in the field would reasonably rely, and plaintiff has not offered any contrary evidence to suggest that underwriters would not reasonably use BLS data.  Again, any criticism of the use of such data for a particular loan goes to the weight of Mr. Butler's testimony and

may be addressed by plaintiff at trial.

### E.     *Legal Conclusions*

Mr. Butler offers opinions that various loans were "materially misrepresented" because of deviations from underwriting guidelines or stated characteristics for the loans. Credit Suisse seeks to exclude all such opinions. Credit Suisse argues that such opinions concerning whether the offering documents contained material misrepresentations represent improper legal conclusions on the ultimate issue for the jury. Credit Suisse also notes that Mr. Butler has been proffered as an underwriting expert and that he lacks the necessary expertise and experience to opine about what information would be material to a purchaser of these certificates.

The Court rejects this argument. It is apparent from Mr. Butler's report that he has not undertaken any analysis of how a reasonable investor would react to alleged misrepresentations in the offering documents. Rather, in conducting his reunderwriting analysis, Mr. Butler has used "material misrepresentation" to refer to a deviation from the guidelines or stated loan characteristics that increases the credit risk for the particular loan in a significant (or "material") way. Thus, it is clear that Mr. Butler has not used the term "material" to refer to materiality from the viewpoint of the securities investor (the "legal conclusion" challenged by Credit Suisse), and plaintiff has disclaimed any broader opinion by Mr. Butler.

The Court agrees that, in response to deposition questioning, Mr. Butler appears to have stated that reasonable investors would find his conclusions to be material. Thus,

the Court grants this motion with respect to any testimony by Mr. Butler concerning materiality to a reasonable investor in RMBS.  The Court declines to exclude other testimony by Mr. Butler, however, as the particular meaning of Mr. Butler's terms—"material" referring to significance to an underwriter, "misrepresentation" referring to a deviation—may be explained for the jury at trial.

## F.   *Particular Certificates*

UBS seeks to exclude Mr. Payne's opinions concerning loans underlying three particular certificates.[9]  For those certificates, the prospectus supplements represented that the loans "were originated generally in accordance with the underwriting criteria described in this section;" and for originators of a smaller percentage of the loans underlying the certificate, that section did not list all applicable guidelines, but instead identified only general procedures that the underwriter had followed.  When Mr. Payne reunderwrote loans from those originators, he applied particular guidelines for those originators.  UBS argues that such analysis by Mr. Payne was improper because there was no representation in the offering documents that those loans were underwritten in accordance with those guidelines—rather, the documents represented only that the general procedures had been followed by those originators.

The Court concludes that UBS has waived this argument that Mr. Payne applied the wrong set of guidelines in reunderwriting loans underlying these certificates.  On

---

[9]MARM 2006-0A2, MARM 2007-1, and NAA 2006-AR4.

April 10, 2014, before plaintiff's experts began their analyses, the Court issued a Loan

File Reunderwriting Protocol (LFRP) to facilitate that discovery process. In that order,

the Court required defendants, in response to a request from plaintiff, either (a) to

stipulate that "a particular Guideline or set of Guidelines applies to a Sampled Loan" or

(b) to state all reasons for disagreeing with the guidelines proposed by plaintiff or

identify other applicable guidelines. In the parties' subsequent stipulations for loans

under these three certificates, UBS did not make this argument or identify any other

applicable guidelines, including the general procedures discussed in the prospectus

supplements.

UBS argues that it did not waive this argument because while it stipulated that

particular guidelines applied for these originators, it did not stipulate that the offering

documents contained any representation that those guidelines were used in the

origination of those loans. That is a distinction without a difference, however. The

LFRP was intended to facilitate the experts' reunderwriting process, and by the relevant

provision of the LFRP, the Court plainly intended to require the parties in advance to

state their positions with respect to the guidelines that would apply to each loan *for all

purposes relating to the reunderwriting*. UBS now argues that, in underwriting certain

loans, Mr. Payne should have applied only the general guidelines set forth in the

prospectus supplements and not the guidelines for those originators to which UBS

stipulated. UBS was required to state that position in response to the LFRP.

Accordingly, UBS waived this argument that only the more general, non-substantive

guidelines should have been applied by Mr. Payne with respect to certain loans, and the Court thus denies the motion to exclude on this basis.

>G.   *Compliance with Rule 26*

Finally, UBS argues that the Court should exclude any opinions by Mr. Payne based on alleged misrepresentations other than those identified in Exhibit 7 to his report. UBS argues that Fed. R. Civ. P. 26 required Mr. Payne to disclose all opinions and bases in his report.  The Court denies this portion of UBS's motion.

In his report, Mr. Payne noted that UBS's offering documents contained various representations regarding the characteristics of the underlying loans, and he proceeded in the report to discuss "some of the most noteworthy representations regarding the credit quality of those loans."  In a footnote, Mr. Payne stated: "I understand that a listing of many of the representations at issue has been provided in appendices to NCUA's First Amended Complaint.  The portions of the Prospectuses and Prospectus Supplements referenced in those appendices are excerpted in Exhibit 7."  Mr. Payne did not purport to identify all representations to which his opinions might relate.  Nor did Mr. Payne offer any opinions that the offering documents contained any misrepresentations. Rather, Mr. Payne opined that there were deviations from guidelines or stated loan characteristics for particular sampled loans that he reunderwrote.  Rule 26 required plaintiff to disclose all such deviations to which Mr. Payne intends to testify, and UBS has not argued that plaintiff's disclosure is deficient in that regard.  Mr. Payne's identification and discussion of those deviations necessarily include the identification of

the particular guideline or characteristic from which there has been a deviation.  Plaintiff is free at trial to prove through other evidence that relevant representations concerning those guidelines or characteristics were actually made in the offering documents.  The Court does not agree with UBS that Mr. Payne was required to identify all misrepresentations alleged by plaintiff.

## IV.    Defendants' Motion to Exclude – Credit Risk Opinions

In a joint motion, defendants seek to exclude certain testimony by the following experts retained by plaintiff:  Steven Butler, Richard Payne, Mark Sunshine, John Wald, and James Barth.  In particular, defendants challenge the experts' opinions based on the premise that non-compliance with an originator's underwriting guideline increases the credit risk for the loan.  Defendants argue that the experts have not identified sufficient bases for that opinion concerning an increase in credit risk.  In this motion, defendants have adopted the similar arguments made by RBS in its case in this Court.

In considering this motion, the Court first notes a distinction regarding the meaning and scope of the increased credit risk referenced by the experts—a distinction that defendants do not appear to acknowledge.  First, an expert might opine that credit risk for a loan (that is, the likelihood of default or delinquency) has been increased in a *relative* sense, such that a defect or non-compliance would indicate that the loan's credit risk is actually higher than it would be for the loan as represented, or for the other loans that do comply with the same guidelines.  Second, an expert might opine that credit risk

for a loan has been increased in an *absolute* sense, such that the mere fact that a loan is non-compliant means that the loan has a higher credit risk than it would if the violated standard did not exist or were more relaxed, all other things being equal.

Plaintiff generally defends its experts' opinions—particularly those of its reunderwriters, Messrs. Butler and Payne—as opinions of an increased risk in the *relative* sense. Defendants, on the other hand, seem to attack opinions concerning increased credit risk in the *absolute* sense. Defendants rely most heavily on a hypothetical in which two loans are equal in every way, but one loan complies with its guidelines while the other is non-complaint because it violates its guidelines' stricter standard for one characteristic. Defendant argues that it makes no sense for one loan to have a higher or increased credit risk in comparison to the other loan simply because of the particular guidelines that apply. Thus, defendant challenges the idea of an increase credit risk in the *absolute* sense.

The Court concludes that there is no basis for the exclusion of any opinions by plaintiff's experts based on the idea of an increased credit risk in the relative sense. Defendants have not explained why such an opinion is not valid. Plaintiff's experts have explained—and defendants have not disputed—that underwriting guidelines are intended to minimize credit risk and the likelihood of default. Thus, it follows naturally that if a loan does not satisfy an applicable guideline standard, the likelihood of default (and therefore, the credit risk) is higher than it would be if the loan satisfied that standard, all else being equal. Plaintiff's experts have offered that opinion, and defendants have not

suggested any reason to doubt that opinion. In the absence of any such basis to question it, the Court concludes that this opinion is sufficiently supported by the experts' experience and expertise in this industry.

The Court then turns to the actual opinions challenged by defendants in their motion. Mr. Butler reunderwrote a sample set of loans and offered opinions concerning whether those loans failed to comply with guidelines and stated loan characteristics in a way that increases the credit risk associated with that loan. Defendants have discussed Mr. Butler's opinions regarding a few specific loans, but they do not directly challenge those opinions. In discussing those examples, defendants have attempted to show that a defect should not necessarily be deemed to increase the credit risk for that loan. Defendants have not suggested any manner, however, in which Mr. Butler's method of applying his professional judgment to that loan was unreliable. If defendants disagree with Mr. Butler's evaluation of a particular loan, including his conclusion that the loan's credit risk was higher than represented, such disagreement goes to the weight of Mr. Butler's evaluation of that loan and may be pursued at trial.

In a direct sense, defendants only challenge certain deposition testimony by Mr. Butler. It is clear that, in part of that testimony, Mr. Butler was discussing increased credit risk in a relative sense, such that a loan's credit risk would be higher than others under that program with the same guidelines, or that it would be higher than as represented. As discussed above, there is no basis to exclude that opinion. In another part of that testimony, however, Mr. Butler did seem to state a belief that non-

compliance may increase a loan's credit risk in an absolute sense, including when confronted with the same hypothetical discussed above.  Mr. Butler did not provide any basis to support that opinion, nor has plaintiff provided any such basis in its opposition to this motion (plaintiff did not address that particular testimony by Mr. Butler).  Indeed, plaintiff has appeared to disclaim any such opinion by Mr. Butler—plaintiff has defended its underwriters' opinions as relating to an increased credit risk in the relative sense, and plaintiff has not explained how any opinion concerning an absolutely increased credit risk could be relevant to the opinions of its reunderwriters.  Accordingly, the Court grants defendants' motion with respect to any such testimony by Mr. Butler, and Mr. Butler will not be permitted at trial to offer any opinion concerning the effect of non-compliance on the credit risk for a loan in an absolute sense.  The motion is otherwise denied with respect to testimony by Mr. Butler.

Defendants argue that the opinions of Mr. Payne are premised on his opinion that non-compliance increases credit risk.  In the portions of his report and testimony cited by defendants, however, Mr. Payne did not express any opinion concerning a relationship between non-compliance and credit risk in an absolute sense.  In fact, when presented with defendants' hypothetical about two identical loans, Mr. Payne related either loan's credit risk to the particular guidelines applied to the loan.  As the Court has concluded with respect to Mr. Butler, any criticisms of Mr. Payne's loan-specific evaluations bear only on the weight of those opinions and do not provide a basis for exclusion, and Mr. Payne is free to discuss the effect of a loan's non-compliance on its

36

credit risk in a relative sense. Otherwise, defendants have not pointed to any instance in which Mr. Payne stated the opinion that non-compliance can affect credit risk in an absolute sense. Accordingly, the Court denies the motion as it relates to testimony by Mr. Payne.

In the testimony cited by defendants, Mr. Sunshine (plaintiff's materiality expert) did not actually state an opinion that non-compliance could increase credit risk in an absolute sense, as opposed to in a relative sense. In another portion of his report (on which Dr. Wald relied), Mr. Sunshine stated that non-compliance "is a red flag that typically indicates the mortgage loan originator has poor internal controls or sloppy management." Defendants have not challenged that particular opinion by Mr. Sunshine, however. The Court denies the motion as it relates to testimony by Mr. Sunshine.

Dr. Wald provided a report in rebuttal to opinions by Ethan Cohen-Cole, defendants' materiality expert. In the portion of his report challenged by defendants, Dr. Wald criticized Dr. Cohen-Cole for presuming that the effect of a misrepresentation is directly proportional to the size of the misstatement. In doing so, Dr. Wald noted that a misrepresentation may suggest a higher credit risk, for instance because the borrower or underwriter has lied or was sloppy. Thus, Dr. Wald appears to have suggested that non-compliance could affect credit risk in an absolute sense. Dr. Wald cited various studies (as well as Mr. Sunshine's report) to support that view. Defendants argue that the cited literature does not actually contain the opinion that non-compliance increased credit risk. Any such dispute about the validity of the opinion based on the import of the

literature, however, goes to its weight of the opinion and not to its admissibility.  Dr. Wald's opinion was not unsupported, and the Court therefore denies the motion as it relates to testimony by Dr. Wald.

Defendants accuse Dr. Barth, plaintiff's loss causation expert, of improperly relying on the opinions of other experts.  Dr. Barth has not stated that, in relying on the conclusions of the reunderwriters, he relied on any opinion concerning increased credit risk in an absolute sense.  The Court therefore denies the motion as it relates to testimony by Dr. Barth.

Finally, the Court rejects defendants "fit" argument.  Defendants complain that plaintiff's experts have not addressed the relevant question concerning whether non-compliance has affected credit risk relative to what a reasonable investor understood that credit risk to be.  The Court concludes, however, that the testimony by plaintiff's experts could be relevant to the jury's determination concerning the materiality of any misrepresentations in the offering documents.


IT IS THEREFORE ORDERED BY THE COURT THAT defendants' separate motions for summary judgment with respect to certain alleged misrepresentations and omissions (Doc. # 437 in *UBS*, Case No. 12-2591; Doc. # 403 in *Credit Suisse*, Case No. 12-2648) are **granted in part and denied in part**, as set forth herein.


IT IS FURTHER ORDERED BY THE COURT THAT plaintiff's motion to

exclude certain testimony by defendants' reunderwriting rebuttal experts, W. Barefoot Bankhead (*UBS*) and Peter Kempf (*Credit Suisse*), (Doc. # 423 in *UBS*, Case No. 12-2591; Doc. # 389 in *Credit Suisse*, Case No. 12-2648) is **denied**.

IT IS FURTHER ORDERED THAT defendants' separate motions to exclude certain testimony by plaintiff's reunderwriting experts, Richard Payne (*UBS*) and Steven Butler (*Credit Suisse*), (Doc. # 432 in *UBS*, Case No. 12-2591; Doc. # 405 in *Credit Suisse*, Case No. 12-2648) are **granted in part and denied in part**, as set forth herein.

IT IS FURTHER ORDERED THAT defendants' joint motion to exclude certain credit risk opinions by plaintiff's experts (Doc. # 427 in *UBS*, Case No. 12-2591; Doc. # 394 in *Credit Suisse*, Case No. 12-2648) is **granted in part and denied in part**, as set forth herein.

IT IS SO ORDERED.

Dated this 19th day of January, 2017, in Kansas City, Kansas.

s/ John W. Lungstrum
John W. Lungstrum
United States District Judge

39