IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

| | | |
|---|---|---|
| NATIONAL CREDIT UNION ADMINISTRATION BOARD, | ) ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | Case No. 12-2591-JWL |
| UBS SECURITIES, LLC, et al., | ) ) | |
| Defendants. | ) ) | |
| ————————————————————— | ) | |
| NATIONAL CREDIT UNION ADMINISTRATION BOARD, | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | Case No. 12-2648-JWL |
| CREDIT SUISSE SECURITIES (USA) LLC, et al., | ) ) ) | |
| Defendants. | ) | |
| ————————————————————— | ) | |

## <u>MEMORANDUM AND ORDER</u>

Plaintiff National Credit Union Administration Board brings these related suits as conservator and liquidating agent of credit unions. The suits relate to a number of offerings involving different residential mortgage-backed securities ("RMBS" or "certificates") purchased by the credit unions. Plaintiff asserts claims under federal and state law against sellers, underwriters, and issuers for the certificates, based on alleged

untrue statements or omissions of material facts relating to each certificate.[1]

These two cases (hereinafter referred to as *UBS* and *Credit Suisse*) presently come before the Court on various motions by the parties to exclude expert testimony.[2]  As more fully set forth herein, the Court rules as follows:

Defendants' joint motion to exclude certain testimony by George Oldfield, plaintiff's due diligence expert, (Doc. # 438 in *UBS*, Case No. 12-2591; Doc. # 399 in *Credit Suisse*, Case No. 12-2648) is **granted in part and denied in part**, as set forth herein.

Defendants' joint motion to exclude certain testimony by various experts for plaintiff (Doc. # 430 in *UBS*, Case No. 12-2591; Doc. # 396 in *Credit Suisse*, Case No. 12-2648) is **granted in part and denied in part**, as set forth herein.

Plaintiff's motion to exclude certain testimony by Arnold Barnett, defendants' sampling expert, (Doc. # 387 in *Credit Suisse*, Case No. 12-2648) is **denied**.


## I.    Defendants' Motion to Exclude – George Oldfield

By joint motion filed in both cases, defendants seek to exclude certain opinions by plaintiff's due diligence expert, George Oldfield.  As set forth below, the Court grants

---

[1]The Court refers to the defendants in Case No. 12-2591 collectively as "UBS".  The Court refers to the defendants in Case No. 12-2648 collectively as "Credit Suisse".

[2]The standards governing the Court's consideration of these motions are stated in the Court's prior opinions in these cases by which it ruled on other motions to exclude expert testimony.

the motion in part and denies it in part.

A.   *Failure Rates Per Securitization*

Defendants seek to exclude any opinion by Dr. Oldfield that any particular securitization had a certain quantified "failure rate" or "sample failure rate." Defendants' due diligence, performed at the time they acquired the pools of loans from which loans were drawn to support the securitizations at issue in these cases, included sampling of some of the pools, in which only a subset of the loans in each of those pools was reviewed.  The sampling was not strictly random; rather, adverse sampling was first conducted, with the sample loans selected based on certain characteristics, which (according to defendants) allowed for the sampling of loans with the highest likelihood of default or defect.  As plaintiff concedes, sampled loans that received a final grade of EV3 (meaning a loan that violated underwriting guidelines without compensating factors) were generally removed and thus were not purchased or included in the securitizations.

Dr. Oldfield calculated a "failure rate" for each pool subjected to such sampling, equal to the percentage of the sampled loans in that pool that received a final grade of EV3.  By the present motion, defendants do not seek to exclude Dr. Oldfield's opinions concerning failure rates for particular loan pools.  Dr. Oldfield, however, also calculated failure rates for particular securitizations, based on the weighted averages of the failure rates for the pools that contributed loans to those securitizations.  Defendants seek to exclude those failure rates for particular securitizations.

3

The Court agrees that those securitization failure rates should be excluded. Dr. Oldfield has conceded that the pool failure rates cannot be validly extrapolated to unsampled loans because the samples were not randomly drawn and thus the sampled loans may not be sufficiently representative. Dr. Oldfield further conceded that he did not know whether the sampled loans made their way into the securitizations. In response to this motion, plaintiff argues that Dr. Oldfield's opinions are relevant to its argument that defendants ignored the high percentage of sampled loans that were rejected. Thus, plaintiff insists that Dr. Oldfield has merely identified a red flag and that he does not offer any opinion that the unsampled loans in the pools or in the securitizations would actually have failed due diligence at the calculated failure rates. By calculating particular securitization failure rates, however, Dr. Oldfield has essentially offered just such an opinion, as those rates cannot represent anything other than a failure rate for the unsampled loans. Moreover, the failure rates for the sampled loans cannot be extrapolated to the unsampled loans, as Dr. Oldfield concedes. Therefore, plaintiff has not identified any reliable basis for Dr. Oldfield's securitization failure rates. Such testimony will thus be excluded at trial, and defendants' motion is granted to that extent.

B.    _Waiver Opinions_

Defendants seek to exclude any opinions by Dr. Oldfield that they "waived" loans that did not comply with applicable underwriting guidelines and that lacked sufficient compensating factors, as well as any opinions concerning the rate at which loans were waived for any particular loan pool or securitization. The Court agrees, and it grants this

4

portion of the motion to exclude.

Clayton Holdings ("Clayton") was a third-party vendor used by defendants to perform acquisition-stage due diligence reviews of some of the loans (either samples of loans from pools or entire loan pools) in the pools from which the loans in the securitizations were drawn. Dr. Oldfield relied on certain Trending Reports for the time period from First Quarter 2006 through Second Quarter 2007, in which Clayton summarized its loan-level reviews for each of the defendants. The reports included figures for the total number of loans "rejected" in each quarter, which loans had received a grade of EV3 from Clayton. The reports also included figures for the total number of "waived" loans each quarter, meaning those with a grade of either EV2W or EV2T. An EV2W grade indicated that Clayton had graded the loan EV3 but that the client (the particular defendant) had determined that the loan was appropriate to acquire. An EV2T grade indicated that the loan was subject to a side letter allowing the loan seller to provide missing loan documentation within a specified time period. The Trending Reports did not indicate how the "waived" loan totals were split between 2W loans and 2T loans. For Credit Suisse, Dr. Oldfield also relied on other Clayton reports showing the number of EV2W loans in five loan pools. Dr. Oldfield calculated the percentages of "waived" loans for each defendant for each quarter from the Trending Reports, and (for Credit Suisse) the percentages of "waived" loans (i.e., EV2W loans) for the five pools. Dr. Oldfield conceded that he could not know whether any of the waived loans ended up in particular loan pools or securitizations. Nonetheless, Dr. Oldfield used the

percentages from the Clayton reports to calculate "waiver rates" for particular loan pools and particular securitizations.  Dr. Oldfield relied on those calculations in opining that defendants routinely waived in (accepted) loans that violated underwriting guidelines and lacked sufficient compensating factors.

The Court first addresses Dr. Oldfield's waiver rates for particular pools and securitizations.  In his report, Dr. Oldfield stated that the particular waiver rates were not intended to be extrapolated, but that he showed those results to illustrate that defendants knew or should have known that significant numbers of loans in the pools from which the loans in the securitizations were drawn did not meet guidelines and lacked compensating factors.  In response to this motion, plaintiff has not argued that extrapolation to other loans is permissible.  Instead, plaintiff insists that Dr. Oldfield has not performed any such extrapolation and that he offers no opinion that the pools or securitizations included a certain percentage of "waived" loans.  By calculating specific waiver rates for particular pools and securitizations, however, Dr. Oldfield has done just that—like the failure rates, those waiver rates could only suggest an estimate of the percentage of loans in the pool or securitization that did not comply with guidelines and lacked compensating factors.  Neither plaintiff nor Dr. Oldfield has provided any reliable basis for the conclusion that the loans in the Clayton reports were representative and could therefore be extrapolated to the pools and securitizations; nor has plaintiff offered any other basis for the specific waiver rates.  Therefore, those rates calculated by Dr. Oldfield are hereby excluded.

The Court next addresses the particular waiver rates from the Trending Reports and the other Clayton reports on which Dr. Oldfield relies.  Defendants argue that any opinions based on the Trending Reports should be excluded because Clayton's corporate witness testified that those reports were "beta", did not represent a finished product, and could not reliably indicate the rate at which loans were accepted that violated guidelines and lacked compensating factors.  The Court concludes, however, that Clayton's own opinion of the reliability of its data is not dispositive here, as Clayton's testimony may be self-serving, and an expert might still reasonably rely on such data (assuming a valid basis for doing so).

Dr. Oldfield relied on the Clayton reports for his opinion that defendants waived in loans that violated guidelines without compensating factors.  Defendants point to three reasons why the reports do not support Dr. Oldfield's conclusion.  First, as the Clayton representative testified[3], the loans indicated as waived in the Clayton reports would include instances in which an original EV3 grade was based on a failure to satisfy a requirement of the client that was in addition to the other applicable underwriting guidelines (an "overlay").  In those instances, the "waived" loan would *not* represent an example of a defendant's acceptance of a loan that violated the originator's guidelines without compensating factors (Dr. Oldfield's purpose in relying on the data).  Plaintiff argues that Dr. Oldfield accounted for overlays by estimating a maximum overlay rate

---

[3]Dr. Oldfield testified that he accepted the Clayton representative's explanations concerning the reports.

(approximately 13 percent of EV3 loans).  He estimated that rate, however, in the context of his analysis of *failure rates* (addressed above), stating in his report that "[t]here was no data available to conduct an analysis of overlays with respect to waived loans."  Thus, Dr. Oldfield acknowledged that he did *not* account for overlays in his waiver rate analysis.

Second, as the Clayton representative further noted, the Clayton reports did not reveal the percentage of loans accepted by the client that violated guidelines without compensating factors because the waived loans in those reports could include instances in which the client itself determined that sufficient compensating factors were present.  Evidence from both defendants and from the Clayton representative indicated that information that might support acceptance of a loan would sometimes go directly to the client, without Clayton's knowledge.  In response to this potential flaw, plaintiff argues only that because defendants have not produced records of such instances, it is speculative to believe that it ever happened that way.

Third, with respect to the Trending Reports only, the reports did not distinguish between waived loans that were graded EV2W and those graded EV2T.  Defendants argue that the "waived" loans therefore could include instances in which the loan only lacked some documentation that was later supplied—which would again mean that the reports cannot show how many loans actually violated the guidelines without compensating factors.  Plaintiff's (and Dr. Oldfield's) response is again that there is no evidence concerning the number of 2T loans for which the lack of documentation was

cured.

Thus, for multiple reasons, the figures in the Clayton reports for "waived" loans do not necessarily correlate with the number of loans accepted by defendants that violated guidelines without sufficient compensating factors.  Plaintiff's only real response is to argue a lack of evidence that the reports' figures for "waived" loans actually included compliant loans.  Plaintiff has flipped the applicable burden, however, as it is incumbent on plaintiff and its expert to demonstrate the reliability of the methodology by which the expert formed his opinions.  Neither plaintiff nor Dr. Oldfield has set forth a reliable basis for believing that the Clayton reports' figures for "waived loans" represent an accurate estimate of the number of loans accepted by defendants that violated underwriting guidelines without compensating factors.  Accordingly, the Court concludes that the data from the Clayton reports is not reliable for the purpose for which Dr. Oldfield used them.

Finally, neither plaintiff nor Dr. Oldfield has identified any basis other than the Clayton reports and his waiver rates for Dr. Oldfield's opinion that defendants waived in loans that violated the guidelines without sufficient compensating factors.  Thus, because those bases are not reliable, the Court also excludes any opinion by Dr. Oldfield concerning a general practice of waiving in such loans, and this portion of defendants' motion is granted.

C. *Biased Valuation Due Diligence*

Credit Suisse seeks to exclude Dr. Oldfield's opinion that a certain portion of

Credit Suisse's valuation due diligence process was "biased toward passing loans that should have failed," as stated in Part XI.B of Dr. Oldfield's expert report. That process was intended to check the accuracy of original determinations of value for the homes collateralizing the loans (generally based on appraisals). Credit Suisse applied a multi-tiered process in which, if certain results from prior steps mandated it, a loan would be subjected to a Broker Price Opinion (BPO) or a desk review (DR). In that final step, if the BPO or DR returned a valuation within 15 percent of the appraisal, the loan was approved with respect to the valuation of the collateral.

Dr. Oldfield noted, however, that if the BPO or DR did deviate significantly from the appraisal value, the seller could rebut the BPO/DR determination and negotiate concerning the appropriate valuation. In his report, Dr. Oldfield opined as follows:

> This rebuttal and reconciliation process permitted sellers and brokers to apply direct pressure to BPO and DR agents, creating an incentive for those agents to return BPO or DR values that were just within tolerance. This interference appears to have distorted Credit Suisse's valuation due diligence process and biased it towards passing loans that should have failed valuation due diligence. This bias would have been evidence to Credit Suisse had they investigated—even preliminarily—the reliability of their BPO and DR process.

Dr. Oldfield's report then included a chart (Figure 14) showing the percentage of BPO valuations falling within particular ranges of percentage deviations from the appraisal values (0-2.5 percent above, 0-2.5 percent below, 2.5-5 percent below, etc.). Dr. Oldfield then opined:

> . . .  A spike at 15% and a substantial drop in frequency at greater deviations suggests that, in the rebuttal process, BPO and DR vendors may

have marked loans as 15% or less deviation that should have been marked at greater than 15% deviation.  This was a warning sign that Credit Suisse should been aware [*sic*] of and taken action to investigate.

Because failing the BPO and/or DR criterion was the main way to fail valuation due diligence, Credit Suisse's valuation due diligence appears to have been biased towards passing loans that should have failed.

In deposition testimony, however, Dr. Oldfield admitted the following:  that he had not performed any analysis to determine whether any seller or broker ever applied pressure to a BPO or DR agent concerning the valuation; that it was not inappropriate for loan sellers to provide certain data if they disagreed with the BPO; that he had not conducted any analysis to determine whether any particular valuation in the due diligence process was incorrect, and did not offer any opinion concerning the reasonableness of any vaulation; that he did not evaluate the reason for the spike that he noted; and that he is not a statistician and does not offer any opinions as such.

The Court agrees with defendants that these opinions should be excluded.  First, plaintiff has not cited any evidence to support the opinion that loan sellers applied pressure to BPO and DR agents.  Dr. Oldfield could not supply any such evidence, and his opinion to that effect therefore constitutes impermissible speculation.  Moreover, Dr. Oldfield conceded that it could be appropriate for the seller to provide information to the BPO agent.  Because he did not evaluate any particular rebuttal or reconciliation, there is no basis for any opinion that that particular part of the process was unreasonable. Finally, Dr. Oldfield admitted that he is not qualified to offer expert opinions as a statistician; thus, he is not qualified to determine whether the "spike" at the 12.5-15

11

percent range in his chart was statistically significant.[4]  Nor did he analyze the reason for the "spike".  Thus, any conclusions drawn from the chart by Dr. Oldfield are not reliably supported.

Accordingly, the Court excludes Dr. Oldfield's opinion that the BPO process was biased towards passing in loans that should have failed the valuation due diligence, and defendants' motion is granted to that extent.  The Court emphasizes, however, that it presently takes no position on plaintiff's ability to present the data underlying Dr. Oldfield's chart to the jury and to argue its significance and reasonable inferences to be drawn therefrom.

### D. *Recitation of Evidence*

Finally, defendants argue that Dr. Oldfield has improperly recited the contents of documents and testimony, including with respect to defendants' knowledge and intent. The Court denies this portion of defendants' motion.  Plaintiff's expert witness is entitled to note the bases for his opinions, including evidence that supports those opinions.  Any concern that Dr. Oldfield has not tied a citation to evidence to a particular expert opinion or that he has improperly weighed evidence is better addressed at trial.  There is no basis to exclude any particular testimony by Dr. Oldfield for this reason at this time.

## II.   **Defendants' Motion to Exclude – Various Experts for Plaintiff**

---

[4]Indeed, that range has a similar frequency to three other ranges in the chart, and all of those ranges are dwarfed by the percentage of loans with *no* adverse deviation.

By a joint motion filed in both cases, defendants seek to exclude certain testimony by the following experts for plaintiff:  Adam Levitin, Gordon Klein, Mark Sunshine, and John Wald.[5]  As set forth below, the motion is granted in part and denied in part as it pertains to Professor Levitin, and it is denied as it pertains to the other three experts.

A.   _Adam Levitin_

Professor Levitin is a law school professor whom plaintiff has designated as an expert with respect to structured securities transactions.  Professor Levitin has offered opinions relating to whether the so-called Sandlot and NGN transactions constitute "dispositions in the market" for purposes of calculating damages.  Plaintiff argues that the Sandlot transactions, in which U.S. Central sold certain certificates to banks who then sold them to Sandlot, do not constitute dispositions in the market.  Plaintiff further argues that the NGN transactions, in which plaintiff transferred certain certificates to the NGN trusts, do constitute dispositions in the market.  Defendants take the contrary positions.  In a prior order in plaintiff's similar case against the RBS and Nomura defendants, the Court denied both sides' motions for summary judgment on those issues, ruling that a question of fact remained for trial concerning whether those transactions constituted dispositions in the market.  _See NCUAB v. RBS Sec. Inc._, 2016 WL 3685210

---

[5]By previous order, the Court denied this motion as it pertains to testimony by expert James Barth, and it granted in part and denied in part the motion as it pertains to testimony by expert Anthony Saunders.  _See NCUAB v. UBS Sec., LLC_, 2016 WL 7373857, at *11-13 (D. Kan. Dec. 20, 2016) (Lungstrum, J.).

(D. Kan. July 12, 2016) (Lungstrum, J.).[6]  The Court construed the statutory phrase "disposed of in the market" in accordance with its ordinary meaning. *See id.* at *4-5.

In his expert reports in these cases, Professor Levitin discussed risk allocation in securitizations generally, and he also offered his opinions concerning whether the Sandlot and NGN transactions constitute dispositions or sales in the market.[7]  He opined that there is no definitive test for whether a transaction is a "sale" and that a range of factors may be considered on the issue, which factors ultimately boil down to a consideration of whether risk and control have been transferred.  Professor Levitin chose to apply a "true sale" analysis used in bankruptcy law, which he considered to be the best method for determining a sale in light of the economic realities of a situation.  In the course of that analysis, he applied certain factors under a particular GAAP accounting rule.  As his ultimate standard, he opined that only the NGN transactions constitute dispositions because only for those transactions would an independent law firm have issued a true sale opinion letter.

Defendants in the present cases incorporate and rely almost entirely on the arguments by RBS and Nomura for exclusion of Professor Levitin's opinions—even though the parties in *RBS* did not yet have the benefit of the Court's summary judgment

---

[6]The parties have correctly assumed that the Court will make the same rulings in these cases that it did in *RBS*.

[7]Professor Levitin also discussed a third set of transactions, the Jefferies transactions, but the parties have not addressed those particular opinions.

ruling.  Essentially, defendants argue that Professor Levitin's legal opinions are not a proper subject for expert testimony, and that he is unqualified to offer any other opinions, including accounting opinions.  *See, e.g.*, *Specht v. Jensen*, 853 F.2d 805, 808 (10th Cir. 1988) (distinguishing between permissible expert testimony on issues of fact and impermissible testimony that invades the province of the jury or articulates the ultimate principles of law).

To a large extent, the Court agrees with defendants.  Professor Levitin will not be permitted to discuss the meaning of "sale" or "disposition" as relevant to the statutory requirements concerning the calculation of damages, as he has done in his report; nor will he be allowed to list various factors that may be relevant to such a determination. The Court has discussed the meaning of the statutory language, and it is for the Court alone to direct the jury's application of that language.  Similarly, the Court will preclude Professor Levitin from discussing whether these transactions would be considered true sales under the bankruptcy analysis or under a particular accounting rule, as this Court has adopted a different standard as set forth in its prior ruling.

Nor will Professor Levitin be permitted to weigh the evidence and give an opinion concerning whether the Court's standard has been met with respect to these transactions, as such an opinion would invade the province of the jury.  Certainly, in some other type of civil action, the Court would not permit a legal expert to weigh the evidence and tell the jury how they should find on the ultimate question of fact, and the fact that the present cases involve the esoteric subject of securitizations does not alter that principle.

15

Similarly, Professor Levitin would be invading the province of the jury improperly if he testified that, based on his consideration of the available evidence, an implied agreement existed between the credit union and the intermediary banks, who acted as the agents of the credit union.  The Court also agrees with defendants that Professor Levitin's "alter ego" opinion should be excluded; although he may be able to testify about a relationship so close that one company essentially controlled the other, the use of that legal term may confuse the jury and treads too close to a legal opinion.

Plaintiff seemingly tries to insulate Professor Levitin's opinions from this attack by arguing that he has offered opinions only from the point of view of market participants (even though the expert himself rarely used such language in his reports). Professor Levitin testified that the true sale opinion would be relevant to market participants such as investors, credit ratings agencies, and financial auditors.  Plaintiff has not shown, however, that Professor Levitin has the necessary expertise to offer opinions concerning what those market participants would find important.  He further testified that the key market participants for his analysis were the independent law firms asked to provide true sale opinion letters.  Indeed, in his reports he stated that, in opining that only the NGN transactions would be considered sales in the marketplace, he means that only those transactions would likely have qualified for a true sale opinion letter. Professor Levitin's improper legal opinion based on a weighing of the evidence, however, may not be protected from exclusion simply by couching that opinion as an expert consideration from the viewpoint of the independent law firm acting as market

participant.  Either way, an opinion is being offered that a legal expert would or would not consider the transactions to be sales, and plaintiff is not entitled to rely on such an expert legal opinion.  Moreover, plaintiff has not explained why the viewpoint of a market participant is relevant—the question is whether these transactions constitute dispositions, not whether investors or anyone else considered them to be dispositions. Accordingly, the Court excludes testimony by Professor Levitin concerning a true sale analysis or whether a law firm would have considered these transactions to be sales.

The Court does not agree, however, that Professor Levitin's testimony should be excluded in its entirety.  Professor Levitin could properly testify as an expert concerning the extent to which these transactions included transfers of risk or control (the key factors considered by him), as such factors may be relevant to the jury's factual determination of whether there were dispositions in the market here.  Similarly, Professor Levitin could provide, as a witness with specialized knowledge, information concerning securitizations generally and these securitizations in particular that would be helpful to the jury.  The Court concludes that Professor Levitin has sufficient qualifications to provide such testimony as an expert in structured secured transactions. Accordingly, the motion as it pertains to Professor Levitin is granted in part and denied in part.

> B.   *Gordon Klein*

Plaintiff offers expert opinions by Professor Klein, an accounting expert, to rebut the opinions of defendants' accounting expert, Stephen Ryan—who, in turn, was

designated as an expert to rebut specific opinions by Professor Levitin. The Court denies defendants' motion to exclude testimony by Professor Klein. First, as an accounting expert, Professor Klein would be entitled to weigh particular evidence (assuming that experts in his field would do so)—in this case, with respect to the existence of an implicit agreement or agency relationship between the credit union and the intermediary banks—if necessary to form a particular accounting opinion. Thus, the fact that Professor Klein weighed evidence does not necessarily warrant exclusion. Second, defendants (in adopting the arguments of RBS and Nomura) seem to argue that accounting opinions are not relevant to this issue of whether there were dispositions in the market. The parties in these cases, however, have not addressed this argument in the context of the Court's summary judgment ruling, even though that ruling was available to the parties. Thus, the Court cannot say that accounting opinions could have no relevance to these factual determinations.

The Court notes, however, that its ruling regarding Professor Levitin (including the exclusion of his testimony applying a particular accounting rule) likely affects the rebuttal expert testimony that defendants will be permitted to offer at trial—which in turn may affect plaintiff's ability to offer testimony from Professor Klein in sur-rebuttal. Any such issue of the proper scope of rebuttal testimony may be addressed at trial.

    *C.*    <u>*Mark Sunshine*</u>

Adopting the arguments from RBS's motion to exclude in the related case in this Court, defendants seek to exclude all expert testimony by Mr. Sunshine. The Court

denies that motion.

Plaintiff offers Mr. Sunshine to provide expert testimony concerning RMBS generally and concerning the materiality of representations in the offering documents to reasonable investors. Defendants argue that Mr. Sunshine is not qualified to offer those opinions. The Court concludes in its discretion that Mr. Sunshine has had sufficient experience relating to RMBS to offer his opinions in this case. Mr. Sunshine has claimed experience with RMBS in a number of ways. Defendants (through RBS) argue that in the relevant time period (2005-2007) Mr. Sunshine did not purchase or sell RMBS. Mr. Sunshine explained, however, that his company accepted RMBS as collateral a number of times in that period, which required him to perform due diligence on those securities, including with respect to re-underwriting the underlying loans. The Court concludes that such experience, along with his other experience (including involvement in the purchase and sale of RMBS in other time periods), is sufficient in these cases. The purported deficiencies in Mr. Sunshine's experience go to the weight of his opinions and may be explored by defendants at trial. Moreover, the Court does not deem fatal the fact that plaintiff characterized Mr. Sunshine's opinions in *RBS* as "common-sense", as the Court concludes that his opinions relate to a subject for which specialized knowledge would be helpful.

Second, the Court rejects defendants' argument that Mr. Sunshine's opinions should be excluded because they are not sufficiently and reliably supported. Mr. Sunshine is entitled to rely on his experience, and he has cited other sources to support

many of his opinions. Again, whether his opinions are sufficiently supported may be explored at trial. Moreover, defendants have not explained why Mr. Sunshine may not rely on the court's findings in *Nomura*, a related case in New York, to provide examples to support his opinions.[8]

Finally, the Court rejects defendants' argument that Mr. Sunshine has improperly acted as a "mouthpiece" for plaintiff's case. As plaintiff notes, the fact that his expert opinions support plaintiff's case does not provide a basis for exclusion. Moreover, Mr. Sunshine may properly explain the materiality standard that he has applied, so long as he does not attempt to instruct the jury concerning the proper legal standard. Any such objection may be raised at trial as appropriate.

      D.     *John Wald*

The Court in its discretion denies defendants' motion to exclude certain testimony by Dr. Wald, who has offered opinions to rebut the testimony of defendants' rebuttal materiality expert. First, the Court concludes that Dr. Wald is sufficiently qualified to offer the challenged opinions concerning the importance of various considerations to a reasonable RMBS investor. Dr. Wald does have experience with RMBS while working in the industry, and he has studied such securities as an academic. Defendants complain that he has little or no practical experience with exactly the same type of RMBS at issue

---

[8]Of course, Mr. Sunshine will not be permitted to substitute that court's findings for his own opinion, but the Court is not persuaded that he has done so impermissibly in these cases.

here, but the Court concludes that his expertise with this sub-specialty of RMBS securities is sufficient.[9]  Defendants' criticisms relating to Dr. Wald's experience go to the weight of his opinions and may be presented at trial.

Second, the Court rejects defendants' argument that Dr. Wald has improperly attempted to supply a legal standard for the jury.  Dr. Wald is entitled to identify the particular materiality standard that he applied in forming his opinions, and it may easily be made clear at trial that the Court will provide the appropriate standard for the jury.

### III.    Plaintiff's Motion to Exclude – Arnold Barnett

At trial, plaintiff intends to offer expert opinions by Charles Cowan, a statistician, by which Dr. Cowan criticizes Credit Suisse's use of adverse sampling in its due diligence process.  Credit Suisse has designated Arnold Barnett, a statistician, as an expert who will rebut the opinions of Dr. Cowan regarding adverse sampling.  Plaintiff seeks to exclude Dr. Barnett's opinions concerning adverse sampling.

The Court in its discretion denies the motion.  First, plaintiff argues that because its experts concede that adverse sampling may be appropriate in some circumstances, Dr. Barnett's testimony to that effect would not helpful to the jury, as that precise issue will be undisputed.  The Court concludes, however, that because plaintiff's experts are

---

[9]In their motions, neither defendants nor RBS (whose briefs defendants incorporate) have explained (or offered their own expert evidence to show) how the differences among types of RMBS are particularly relevant to this precise question of the expertise needed to render the challenged opinions.

critical of the use of adverse sampling by Credit Suisse, Dr. Barnett's testimony concerning the use of such sampling and its benefits is relevant and may be helpful to the jury in evaluating Credit Suisse's due diligence defense.  Dr. Barnett's opinions concerning adverse sampling go beyond the mere opinion that such sampling may be used in certain circumstances, and Credit Suisse is entitled to offer expert testimony to rebut specific opinions by plaintiff's experts.

Second, plaintiff argues that Fed. R. Evid. 702(d) precludes Dr. Barnett's testimony because he has not evaluated Credit Suisse's particular use of adverse sampling and thus has not applied any opinion to the facts of this particular case. *See id.* (expert may testify if, among other requirements, "the expert has reliably applied the principles and methods to the facts of the case").  Again, however, Dr. Barnett has been designated as a rebuttal expert, and because he will address particular opinions by plaintiff's experts, his own opinions are not offered merely in the abstract, but rather they are sufficiently tied to the present case.

Third, the probative value of Dr. Barnett's opinions is not substantially outweighed by a danger that the jury will be confused or misled, as the scope and bases for Dr. Barnett's opinions may be easily explained the jury.  Therefore, the Court denies plaintiff's motion for exclusion under Fed. R. Evid. 403, and it denies this motion in its entirety.

IT IS THEREFORE ORDERED BY THE COURT THAT defendants' joint motion to exclude certain testimony by George Oldfield, plaintiff's due diligence expert, (Doc. # 438 in *UBS*, Case No. 12-2591; Doc. # 399 in *Credit Suisse*, Case No. 12-2648) is **granted in part and denied in part**, as set forth herein.

IT IS FURTHER ORDERED BY THE COURT THAT defendants' joint motion to exclude certain testimony by various experts for plaintiff (Doc. # 430 in *UBS*, Case No. 12-2591; Doc. # 396 in *Credit Suisse*, Case No. 12-2648) is **granted in part and denied in part**, as set forth herein.

IT IS FURTHER ORDERED BY THE COURT THAT plaintiff's motion to exclude certain testimony by Arnold Barnett, defendants' sampling expert, (Doc. # 387 in *Credit Suisse*, Case No. 12-2648) is **denied**.

IT IS SO ORDERED.

Dated this 8th day of February, 2017, in Kansas City, Kansas.

s/ John W. Lungstrum
John W. Lungstrum
United States District Judge

23